My location for argument this morning is 23-1403 G.C. Columbia v. G.S.L. Mr. Dingler? That's correct, Your Honor. Good morning. May it please the Court. My name is Wilhelm Dingler. I'm in the Seattle office of Bolivin Hauser Bailey, and we represent the appellants in this matter, G.C. Columbia. I will, throughout this argument, probably refer to my client as the Columbia Center, which is what it is commonly known, and it is a building which is located in downtown Seattle. I would also like to reserve six minutes for rebuttal, primarily because I believe your questions will be more important than my argument. But this case is relatively straightforward. My client oversees the Columbia Center. The Columbia Center is the fourth-largest building west of the Mississippi. It has 1,538,000 square feet. Well, we've got the background. We've read the briefs. So do you think the board here is having sort of alternate findings? Yes. Okay. I do. So deal with each of those. Well, the first one, of course, is that they said that even if they found that the provision of force majeure and all of the delay clauses that are in the contracts did apply to the real estate tax adjustments, we made no showing that COVID actually affected the ability to provide documentation for the real estate tax adjustments. That finding was made by Judge Sheridan, and it's wrong. It's wrong when you're at the 12B6 level. That engrafts, we believe, a requirement that is found in Rule 56. At the 12B6 phase, and I'm not going to belabor the case law that's in the briefing. It's all there, and it is very, very clear. Even if the court were to disagree with whether or not – sorry, I want to find the exact – Well, if you agree with the board that this doesn't come with – the provision for exclusion of delays doesn't cover this tax adjustment, that's the end of the case, right? Oh, I agree with you. Can I just ask one question? Absolutely. When I looked at the leases, and the leases have a certain number of square feet in the property being given over to the government under the lease, right? Correct. Wasn't the liability for the real estate and the tax on the building dependent on the square footage? The square footage the GSA is leasing, Your Honor? Well, I mean, so it's – what you're trying to say is, well, there's – and these tax increases are what came – Or decreases. Decreases apply to the whole building, right? The whole rentable building. Well, the whole rental – And may I interrupt, Your Honor? Can't you calculate the government share by just looking at the number of square feet they had under the lease? And that's exactly – that's exactly my point, Your Honor. That's not the analysis. The analysis is a comparison pro rata of that which is then leased. So it was what is leased in 2020 by the GSA versus the gross overall amount of leasing of the rest of the building. If there are 17 empty floors, for example, of square footage, we are not going to charge the GSA for those. We actually calculate – But you're going to charge them every penny for every square foot they leased. Correct. Correct. But the tax bill, as sent to Columbia Center, is one gross number. And it's a gross number that applies to what? The entire building. To the building. Correct. Correct. And so if there are – in addition to the – You wouldn't get a proportion of the square footage in the building and say the square footage is this and government has this and that's their share. That begs the question because we would never do a tax adjustment. Oh, that's fine. The tax adjustment wouldn't have to be done in the lease every year if it were always the same. Well, I guess what I think Judge Clevenger is getting at is, I mean, you filed your tax return 10 days early during COVID, which is very impressive. But what is – May I interrupt, Your Honor? Yes. We paid a tax bill. We did not file a return. Okay. Okay. You paid the tax bill. I apologize. I guess I'm just not hearing in your analysis of what you had to provide the government in order to make this thing, what the problem was. I mean, you had 60 days. I mean, and you say, well, it's just a 12B6. Well, you've got to give the court something under Iqbal Twanli. You've got to say something, and I'm not seeing where that something is. And what I think the something is, Your Honor, is that there is a qualitative difference between receiving a bill that says, pay me X millions of dollars for your taxes for 2020 and writing a check versus doing an audit of the available rentable space, finding out what the square footage is attributable to each person and each tenant. Well, you know, you already have the square footage of each parcel in this building. I've got to assume it's somewhere you've used it before for other purposes, like the prior year or whatever. So what's the big deal about finding out what GSA rented and what they didn't? No, it's not what GSA rented. It's what the other tenants in the building, because I can't charge GSA a pro rata share against tenants that aren't there. They only pay their pro rata share. And that's why the tax is adjusted every year based upon the amount of tenants. And you don't have their share relates to other people? Right, because the tax bill that comes to the Columbia Center is X, right? And then X gets parsed into GSA's share. Pardon? What's the number of square feet in the building? You know, I'm not certain what the tax assessments are in King County, but I believe it is based upon the number of square feet in the building and its location, so that it's a C3 zone or a C1 zone. You've got to differentiate between what the GSA space is and what the non-GSA space is, right? Correct. And those records aren't readily available? They are, Your Honor, but we're talking about the overlay and the reason for the appeal of COVID-19 and the incredible amounts of closures and the inability of people to even get into the office to do a lot of that work. But they couldn't have done some of that remotely? Oh, yes, they could ultimately, and they did. And it took them an extra 30-ish days, and that's the issue here. That is the entire issue. They were hamstrung by their ability. And, in fact, I re-polled. Looking at some of the leases themselves, and I'm just going to tell you some of the last numbers. It looks like it's 6680, 7135, and 7198. The only place where I saw the excusable delay is invoked is in the default delivery clause. Do you agree with that? In 6680, I would agree with you, and that's in Appendix 78 for the other two judges. And I would agree with you that that particular lease only has that provision, but that provision is, in our opinion, sufficient for our purposes and for our argument that there was, through no fault of the lessor, there was this delay in the ability to issue the tax adjustment bill. Go ahead. I thought that the tax adjustment clause was very specific and it said, waiver right if the relevant documents are not received on time. Do you agree with that? Well, I agree with that. It is cut and dry that but for an excuse in some other part of the contract. And what we're arguing is is that excusable delay in Appendix 78, 6680, and then the force majeure clauses in the other contracts, read in para materia, tell us there is an avenue for Columbia Center to say that we are excused from the strict 60-day requirement by virtue of those clauses. And the excuse, and it's not as though we didn't spend that $750,000 tax bill years later. We spent it 35 days later, 60 days later. I believe it was in March. So it was 60 days late, essentially. And while I agree, the clause is specific. It says if you're 61 days, you're out. But for those two, why are those clauses in those contracts? If not for the ability of the lessor to be able to take advantage in certain circumstances when it is beyond their control, which is clearly this is the case. It was beyond their control that Governor Inslee issued orders to the state of Washington called Stay Home and Stay Healthy. It's Appendix, one second. This is all done remotely. You can't just stuff them done remotely. We're talking about paper trails. We're talking about examining documents. Your Honor, I have no argument with that at all. You are correct. A paper trail. So if whether people, as in this court, whether people were forced to work remotely has, depending on what you're talking about, has great impact or has very little impact. When we're dealing with just getting together documentation, presumably they were collecting the rents. They were probably doing repairs all this time. I mean, the world was going on, particularly when we're dealing with just looking at documents and records that you have and putting them together. Aren't these questions exactly why 12b-6 should not have been granted? There are questions. There are issues about whether or not those things. Well, it's a question of who has to do how much at the beginning to establish that there are questions. And the question to examine is whether or not you're simply saying COVID, oh, my God, it disrupted the whole world, and Governor Inslee said everybody should stay home, whether that is at all relevant or telling to the question here about excusable delays. I believe that in concert with the issuance by my client of its stay-at-home order, which you can find at APPX 684. It's part of our claim letter. In accordance with Governor Inslee's stay-home, stay-healthy order, and this, by the way, was dated April of 2021. All right? So that was after this happened? Right. So by April of 2021, my client is still telling its employees, since March 23rd, the offices of urban renaissance groups have been closed and all non-essential workers are asked to work remotely, including accountants. Wait a minute. I just hadn't caught this before, but you're saying that the order to work remotely came after this would have been done? No. What year are we in? What I'm suggesting is that a year later, when the tax bill was sent out, there were still massive restrictions on the ability to get into the office, is what I'm suggesting. This is just an extension of the original March 2020. Am I confusing you, Your Honor? No, I'm good. The stay-home order from the company covered from December 20 through April 2021. Correct. That's the second one. Pages 683, 684 on the record is the only evidence I believe that you put in front of the board to support your argument that there was a COVID problem here. You mean this letter? Yes. That's incorrect, Your Honor. In terms of why it was that COVID stood in the way of getting this done on time? And again, I have to say. Is there something other than this letter? Well, Governor Inslee. We asked you to complain. Governor, come on. Well, this goes to the question of how much information was in front of the board to support your argument that COVID got in the way of being able to do this within 60 days. I would submit first. That's the cart before the horse. There is sufficient evidence to suggest that there is something to send this case down the road. That's the argument. The argument is. But can you answer Judge Croninger's question? He asked you, is this the only thing that you presented? No, it's not. What else did you present? Give us appendix pages that you're going to give us something else. Okay. The appendix pages start at. I have this written down somewhere. I apologize. 683 through 962. Approximately 279 pages of evidence and information. Yes. The entire appendix from. See the number again. 683 through 962 were all submitted with part of the claim letter. All of this goes to the fact that there was COVID going on. I'm talking about information as to why COVID was preventing your client from making the calculations. Departments that experienced the highest difficulties included accounting, property management, and leasing. That's in the letter. That's in the letter. In what my client stated. In their admissive to their employees. Appendix 684. It's the last. The indented sentence. Yes. We're not asking this court to dispense with any typical usual or customary legal procedures or inquiries. We're asking this court to, in fact, enforce that at a 12 B6 phase. Everything is considered and construed in favor of my client. Any inferences therein should also be construed in their favor. At this point, it is our position that the Civilian Board of Contract Appeals essentially engrafted a standard which far exceeds the 12 B6 standard. We have provided sufficient information to move this case one step further down the road. Okay, thank you. You've exceeded your reserve rebuttal time. Thanks. Good morning, Your Honor. This may please the court. The court should affirm the decision of the board because the board correctly determined that G.C. Columbia failed to state a claim for which relief can be granted. It is uncontroverted that each of the five leasing contracts contain clear, expressed language that in order to obtain a tax adjustment, the lessor here, G.C. Columbia, was required to submit to the contracting officer evidence of the payment of the taxes and an invoice for the requested tax adjustment within 60 days, 60 calendar days, I should say, of when the tax payment was due to the tax majority. Let me just switch to where we ended with your friend here, which is let's assume we're talking about whether or not there's sufficient, let's assume this is covered, and the question is whether or not there was sufficient stuff claimed for the case to go forward. So what's your answer to, I guess, his best evidence, which is the letter from the governor talking about the difficulties of COVID and departments that experienced the highest difficulties, including accounting, property management, and leasing. Why isn't that sufficient under Iqbal's formula? I have several responses to that, Your Honor. First, pursuant to Twombly and Iqbal, allegations that are merely conclusory are not entitled to be assumed to be true. And that is what G.C. Columbia is requesting here. Rather than engaging in the summary judgment analysis, the board correctly stated that mere general reference to COVID is not enough. Here, first, I would like to correct the record because the leasing contracts specifically demonstrate how the tax adjustment is required to be made. And as an example, on appendix page 41, paragraph F, it states that the government shall pay its share of tax increases based on the ratio of the percentage of occupancy. Where is this on page 41? Page 41, Your Honor. That's a bit vague. Yes, section F. So it's section 3.4F, paragraph F. And that's the first sentence. And then section 3.5 states that the percentage occupancy will be established during negotiations. And then if we look at the... So this part is the solicitation, which was made part of the contract. If we look in the actual contract document, it specifically states what the percentage of occupancy was. And that is on page 22, Your Honor. Exactly, Your Honor. So the allegation that the offices were closed and no one could enter the building to go measure the square footage and all of that, that's inaccurate because the percentage of occupancy was already determined in the leases. And that's on pages 22, 121. I think your argument is broader than that. He's saying, look, in COVID, there are a lot of people, even if the people were working from home, a bunch of people were sick. Some people were dying. Some people were at the funeral home grieving all the people who died. That it was chaos. Your Honor. And he says he's pleaded enough here, given the fact that you can take judicial notice of things like, especially in the state of Washington, where these retirement homes, as I recall, were killing off people in the electric break. So he's saying he's put in enough that court can take judicial notice that these things were happening so that if he's made a case on this contract, at least he's in court to be able to argue that COVID was in the way. Your Honor, what G.C. Columbia has provided is a general policy stating that the accounting department has been impacted. As the panel noticed earlier, G.C. Columbia was able to pay its taxes on time, early even. So here, and this is not included in the record, but the email, the submission for the tax adjustment is two pages. It's not in the record. It just goes to show that the submission was two pages. It was one invoice with a single line, and the second page was a calculation. I'm sorry. Is it the government's view that no on-site investigation or measuring, people didn't have to go into every apartment with the measuring tape? Is it the government's view that the information necessary to complete this work is a paper trail? Yes, Your Honor. It could have been done remotely. It was an email submission. As I mentioned, the percentage occupancy is on pages 22, 129, 308, and 493 of the appendix. If he had attached to his complaint an affidavit from the six people who had been in his accounting department, been doing the same thing for 20 years, were all hospitalized with COVID during the relevant period of time, would that have been sufficient? Your Honor, no, because the excusable delay here does not apply to, and this is the other part of our argument, which I think is a more important part, the excusable delay provision. We're now talking about whether he's got a COVID out. Sure, Your Honor. Under that scenario, I believe that would qualify. That's a good answer. Now take us to the first part, which is your more legal question. Yes, Your Honor. Regarding the excusable delay, the general clauses only define the term where it applies in the leases. The only place in the leases where the term is used is in the default in delivery dash time extension clauses. And the default in delivery clause relates to default by DC Columbia in the delivery of the premises to the government by the delivery date. And in that circumstance, it states that the government is entitled to terminate the lease unless the exception of excusable delay applies. The excusable delay does not apply to the tax adjustment clauses. First, the term is nowhere used in the tax adjustment clauses. In fact, those clauses have their own set of definitions for the relevant terms, such as taxing authority and percentage occupancy. And those definitions do not include excusable delay. Are there cases where this has already been decided, something close to this? Which of your cases? Your Honor, the board did address a few cases in its decision. None of which involved other contract issues. I read them all. All those other cases give fair warning to people who lease to the government that you better be aware of that 60 days because it bites like a crocodile. But none of them involve allegations by the lessor that there were contract terms that gave them away. Yes, Your Honor, but case law is clear that we have to give contracts their ordinary meaning. And parties are bound by the terms to which they agree. And here the language is clear, unequivocal, and does not provide for any exceptions. Where the exception applies, it's explicitly stated in the leasing agreement. What would happen if we disagreed with you and found perhaps on one clause, the one contract that has the enhanced dealing with COVID, if we found that one applied? There was a reference in your ever-so-deleted arguments, very much as a course of conduct here. If we found on one, it applies to all. Is there any way that if we ruled in favor of the contractor on one contract, there would be a remand for consideration of whether or not there was some type of a course of conduct that swept across all the contracts? Your Honor, that's an argument that G.C. Columbia had made to the board, and the board did not address it. I don't believe that that argument was raised here before the court. If it wasn't preserved in the record, I would be encouraged to know. It was preserved in the record. It was part of a supplemental argument that G.C. Columbia had submitted to the board in response to a board order. And the government did not, I don't believe the government responded to that because it was a supplemental argument, and it was not mentioned here. It hasn't been argued here, and therefore we would argue that it's been waived. Well, it doesn't matter if it's waived. We're not going to reach it at this level, I don't think, because there's certainly no basis for us to decide whether there was a course of conduct or whether all five of these contracts should be treated for this purpose. I was just curious to know whether the argument had been made below, and you said it was. Thank you. Yes, Your Honor, it was. I also wanted to discuss the Section 10 that appeared in only one of the leases. Similar to the excusable delay provision, Section 10 concerns default by the lessor and gives the government the ability to terminate the lease in that situation. Failure to submit a tax adjustment request within the contractually required 60-day time limit is not a lease requirement. It is a failure to exercise a right under the lease. There's no threat of default if G.C. Columbia did not submit a tax adjustment request in a timely manner. The only consequence is that it waives its right to seek reimbursement. Under G.C. Columbia's argument, as we explained in our brief, its failure to submit the tax adjustment request within the contractually required time frame would entitle the government to terminate the lease because it would be considered a default on the part of G.C. Columbia. This is a nonsensical result. Unless the Court has any other questions. Thank you, Your Honor. We respect the request that the Court affirm the decision of the Board. Thank you. As I said earlier, I'm a man of two words, or I try to be anyway. Just some misconceptions. The question was from you, Your Honor. You said, isn't this just a situation where there's a paper trail and you can do some calculations? Why would there be an adjustment every year if it's always the same? The reason is because it's not always the same. It's different every year. And the percentage of occupancy, contrary to my learned counsel— I don't understand what you mean. It may be different every year. That doesn't mean that it's based on a paper trail that's existing. If a tenant moves out and another moves in, it should. I'm not suggesting that tenants need to make the same for decades. But why is it still not based on a pretty simplistic paper trail? That's a good question. And I think in some respects it is based on a paper trail. But it is a paper trail that requires a significant amount of mustering, as it were. One needs to know, you know, in April or in June or in July, what was the percentage occupancy of the building? We have to do all those calculations so that we can figure— For what purpose? Pardon? For what purpose? To determine what percentage of the tax bill is attributable to each lessee. Even if GSA didn't occupy one square foot of these leases, you're going to charge them for the whole rent, right? There's no excuse in the lease for GSA that says, oh, well, we're not occupying it, we don't pay. No, no. Maybe I've misstated my argument. It's not that whether a GSA is physically in the building or not. I concede that they have the amount of square footage they have, and it doesn't matter if none of them ever came into work at all. They are leasing that space. I'm talking about the totality of the building, the number of lessees, and the ability of my client to do that calculation. The number of square feet in the building doesn't depend on occupation? No, no. The number of square feet occupied. The size of the building? The number of square feet rented. Not occupied, because occupied would suggest physical presence. But you get a rental payment presumably every month. Correct. So based on the rental payments that are accepted on a monthly basis, you should have a monthly paper trail of what's rented and what's not, right? And the only thing I can say in response to that, Your Honor, is by virtue of the fact that there were so many things that hamstrung my client's ability to physically check all those things and see all those documents and do all those things, is why it was inappropriate to dismiss it at this stage. The court below never allowed a proper record to be made. Okay. Thank you. Thank you. We thank both sides. Thank you very much. The case is divided. Thank you. We shall proceed.